# UNITED STATES DISTRICT COURT

for the

Southern District of New York

DISPLAY POINTS GROUP, INC., dba DISPLAY
POINTS NETWORK, a Delaware corporation

|  |  |
|---|---|
| *Plaintiff* | ) |
| v. | ) |
| DC MEDIA & MARKETING dba DC SALES, | ) |
| INC., a Nevada corporation | ) |
| *Defendant* | ) |

Civil Action No. **12 CIV 6563**

**JUDGE GRIESA**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   DC Media & Marketing dba DC Sales, Inc.
5524 South Fort Apache Road
Suite 110
Las Vegas, NV 89148

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Thomas S. Onder, Esq.
Stark & Stark, P.C.
993 Lenox Drive, Bldg. Two
Lawrenceville, NJ 08648

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

*CLERK OF COURT*

Date: **AUG 2 7 2012**

_____
*Signature of Clerk or Deputy Clerk*



**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

1 2 CIV 6563



DISPLAY POINTS GROUP, INC., dba
DISPLAY POINTS NETWORK, a Delaware
corporation,

                Plaintiff,

v.

DC MEDIA & MARKETING dba DC
SALES, INC., a Nevada corpoation,

                Defendants.

**RULE 7.1 CERTIFICATION**

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, the undersigned counsel for

Display Points Group, Inc., dba Display Points Network, a private non-governmental party, certifies

that it has no parent company and that no publicly held corporation owns 10% or more of its stock.

Dated: August 24, 2012

STARK & STARK
A Professional Corporation

By:

THOMAS S. ONDER
993 Lenox Drive, Bldg. Two
Lawrenceville, NJ 08648
Telephone: (609) 219-7458
Facsimile: (609) 895-7395
tonder@stark-stark.com
*Attorneys for Plaintiff*

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

JUDGE GRIESA

**STARK & STARK**
A Professional Corporation
Thomas S. Onder (7880)
993 Lenox Drive, Bldg. 2
P.O. Box 5315
Princeton, New Jersey 08543-5315
(609) 896-9060
Attorneys for Display Points Group, Inc.

**12 CIV 6563**

AUG 27 2012

U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DISPLAY POINTS GROUP, INC., dba DISPLAY POINTS NETWORK, a Delaware corporation | **CIVIL ACTION NO.** |
| Plaintiff, | *Civil Action* |
| vs. | |
| DC MEDIA & MARKETING dba DC SALES, INC., a Nevada corporation, | **COMPLAINT** |
| Defendant, | |

Plaintiff, Display Points Group, Inc., dba Display Points Network, a Delaware corporation ("Display Points") with its principal place of business at 375 Hudson Street, 7th Floor, New York, NY 10014, by way of complaint against Defendant, DC Media & Marketing dba DC Sales, Inc., a Nevada corporation ("DCMM") with a business mailing address of 5524 South Fort Apache Road, Suite 110, Las Vegas, NV 89148 says:

**Jurisdiction and Venue**

1. This Court has jurisdiction over this matter under 28 U.S.C. §1332 because of diversity of citizenship and the amount in controversy exceeds the sum of $75,000.

2. Venue is proper in this Court under 28 U.S.C. §1391(b)(2) as a substantial amount of the

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

business regarding this matter occurred in New York State and 28 U.S.C. §1391(b)(1) and 28 U.S.C. §1391(c)(2) because the Defendant's business and residency subjects them to the jurisdiction of this Court.

**The Agreement**

3. On or about June 1, 2011, Plaintiff, Display Points and BK SEMS USA, Inc., a California corporation, entered into joint venture agreement (the "Operating Agreement") whereby the two companies would possess a 50% ownership interest in BK SEMS Media, LLC dba Display Points Network, a California limited liability company ("BK SEMS Media"). (See attached a true and correct copy of the Operating Agreement as "Exhibit "A").

4. Among the provisions of the Operating Agreement was that BK SEMS Media named David Hazzard as its Manager, who's powers included management of:

> ...the business, property, and affairs of the Company, including without limitation, the power to exercise on behalf of and in the name of the Company...

(See Operating Agreement, Section 4.3.1).

5. On or about January 19, 2012, BK SEMS Media at the direction of its Manager, David Hazzard, contacted Defendant, DCMM to enter into a business agreement to marketing tabletop devices (the "Devices") at restaurants, bars, and similar establishments ("Venues").

6. On January 27, 2012, Defendant, DCMM's representative contacted David Hazzard directly as to the status of the business agreement. (See attached a true and correct copy of the January 27, 2012 email chain as "Exhibit "B").

7. On or about January 31, 2012, BK SEMS Media entered into an agreement (the

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

"Agreement") with Defendant, DCMM for marketing of the Devices at Venues. (See attached a true and correct copy of the Agreement as "Exhibit "C").

8. The terms of the Agreement provided that Defendant, DCMM was to procure persons, companies, businesses and other entities to enter into advertising sales agreements ("Advertising Sales Agreements") and venue procurement agreements ("Venue Procurement Agreements") with BK SEMS Media for placement of the Devices at Venues. (Collectively, the "Advertising Sales Agreements" and "Venue Procurement Agreements" shall be referred to as "Advertising/Venue Agreements").

9. A substantial amount of the business to be generated by the Advertising/Venue Agreements was to occur in New York.

10. As a condition of the Agreement, Defendant, DCMM was to submit and obtain approval of any Advertising/Venue Agreements from BK SEMS Media prior to entering into any Advertising/Venue Agreements. (See Section 2.2.1 of the Agreement).

11. As a condition of the Agreement, Defendant, DCMM was to only use BK SEMS Media's approved Advertising/Venue Agreements. (See Section 2.2.4 of the Agreement).

12. As a condition of the Agreement, Defendant, DCMM was to submit on or before July 31, 2012 to BK SEMS Media a report outlining its performance (the "Performance Report"). (See Section 3.2 of the Agreement).

13. The Agreement provided that compensation would be based as follows:

   a. $1,000 for each Venue presented by Defendant, DCMM and approved by BK SEMS media that executed a Vendor Procurement Agreement;

   b. $250,000 as an initial payment for services; and

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

-3-

c. $250,000 once BK SEMS Media obtained 250 Venue Procurement Agreements through the efforts and services of Defendant, DCMM.

14. The Agreement also provides that the prevailing party in any action shall be entitled to recover its attorneys' fees and costs. (See Section 4.12 of the Agreement).

**The Assignment**

15. On or about April 1, 2012, BK SEMS Media amended the Agreement and assigned their rights and responsibilities to Plaintiff, Display Points. (See attached a true and correct copy of the Assignment as "Exhibit "D").

16. Prior to executing the Assignment, David Hazzard spoke with Dan Curtin, President of Defendant, DCMM to advise of the Assignment.

17. Dan Curtin confirmed that Defendant, DCMM was in agreement with the Assignment and that he, on behalf of Defendant, DCMM would execute a requisite document, if need be, for the Assignment, so long as Defendant, DCMM was paid the $250,000 initial payment to perform the requisite work.

18. Based on Dan Curtin's representations regarding confirmation of the Assignment, Plaintiff, Display Points sent Defendant, DCMM a wire for the $250,000 initial payment. (See attached a true and correct copy of the wire confirmation as "Exhibit "E"). Hereinafter the Agreement and Assignment shall be collectively referred to as the "Agreement".

19. Upon information and belief, DCMM deposited the $250,000 initial payment.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

**Default**

20. On May 9, 2012, Plaintiff, Display Points and Defendant, DCMM held an all-day meeting to discuss Advertising/Venue Agreements procurement procedures, specifically that all such Advertising/Venue Agreements were to be submitted to Plaintiff, Display Points for approval.

21. On or about May 9, 2012, Plaintiff, Display Points inquired as to the signed Assignment from Defendant, DCMM.

22. On June 5, 2012, Defendant, DCMM requested two (2) Devices from Plaintiff, Display Points. (See attached a true and correct copy of June 5, 2012 email chain as "Exhibit "F").

23. On June 5, 2012, Plaintiff, Display Points responded to the request for the two (2) Devices, advising that it would send the two (2) Devices. (See Exhibit "F").

24. Plaintiff, Display Points further advised that it required Defendant, DCMM's signature of the Assignment that has been sent in April and which has previously been orally agrees to by Dan Curtin, as President of Defendant, DCMM. (See Exhibit "F").

25. In addition, Plaintiff, Display Points advised that it had failed to receive a timeline, status of marketing efforts, as well as a Performance Report pursuant to the Agreement. (See Exhibit "F").

26. Despite not being provided with a timeline, status of marketing efforts, as well as a Performance Report, on or about June 11, 2012, Plaintiff, Display Points sent two (2) Devices upon request from Defendant, DCMM.

27. On June 13, 2012, Plaintiff, Display Points again inquired as to the signed Assignment as well as the numerous defaults by Defendant, DCMM. (See attached a true and correct copy of June 13, 2012 email chain as "Exhibit "G").

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

28. On or about June 15, 2012, Defendant, DCMM advised Plaintiff, Display Points that it believed the Agreement was in valid.

-5-

29. On or about July 9, 2012, Defendant, DCMM advised Plaintiff, Display Points that it had not submitted:

    a.   any Advertising/Venue Agreements for approval; and

    b.   any Performance Report.

30. Plaintiff, Display Points immediately demanded either the cure of the default or return of its initial $250,000.

31. On or about July 24, 2012, Defendant, DCMM advised Plaintiff, Display Points it would not return the $250,000.

32. On or about July 30, 2012, Plaintiff, Display Points sent formal notice to Defendant, DCMM demanding return of the $250,000 and terminating the Agreement. (See attached a true and correct copy of the Default/Termination Letter as "Exhibit "H").

## COUNT ONE – BREACH OF CONTRACT

33. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length.

34. Plaintiff and Defendant entered into the Agreement.

35. Defendant was provided $250,000 for consideration of expected marketing services pursuant to the Agreement.

36. No marketing services or a *di minimis* amount of marketing services were provided by the Defendant as set forth in the Agreement.

37. Plaintiff terminated the Agreement due to Defendant's failures to provide marketing services as set forth in the Agreement.

38. Plaintiff has incurred damages, including attorneys' fees and costs and loss of business in excess of $75,000.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

**WHEREFORE,** Plaintiff, Display Points Group, Inc., dba Display Points Network, a Delaware corporation demands judgment against Defendant, DC Media & Marketing dba DC Sales, a Nevada corporation, as follows:

>   (a) for damages equal to the $250,000 initial payment, plus interest, damages, reasonable attorneys' fees and costs, and other expenses and charges; and
>
>   (b) for such other and further relief as is equitable, appropriate and just.

## COUNT TWO – UNJUST ENRICHMENT

39. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length.

40. Defendant has been unjustly enriched by accepting the $250,000 for consideration of expected services pursuant to the Agreement and failing to deliver marketing services as set forth in the Agreement.

**WHEREFORE,** Plaintiff, Display Points Group, Inc., dba Display Points Network, a Delaware corporation demands judgment against Defendant, DC Media & Marketing dba DC Sales, a Nevada corporation, as follows:

>   (a) for damages equal to the $250,000 initial payment, plus interest, damages, reasonable attorneys' fees and costs, and other expenses and charges;
>
>   (b) compensatory damages; and
>
>   (c) for such other and further relief as is equitable, appropriate and just.

## COUNT THREE - FRAUD

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

41. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length.

42. Defendant represented that it would perform pursuant to the terms of the Agreement.

43. Plaintiff reasonably relied upon Defendant's representations that it would perform pursuant the terms of the Agreement.

44. Plaintiff has been damaged by the fraudulent conduct of Defendant.

45. Defendant's conduct is a direct and proximate cause of the damages incurred by Plaintiff.

**WHEREFORE,** Plaintiff, Display Points Group, Inc., dba Display Points Network, a Delaware corporation demands judgment against Defendant, DC Media & Marketing dba DC Sales, a Nevada corporation, as follows:

> (a) for damages equal to the $250,000 initial payment, plus interest, damages, reasonable attorneys' fees and costs, and other expenses and charges;
>
> (b) compensatory damages; and
>
> (c) for such other and further relief as is equitable, appropriate and just.

## COUNT FOUR – PROMISSORY ESTOPPEL

46. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length.

47. Defendant made a clear and definite promise to provide marketing services as set forth in the Agreement.

48. In exchange for this promise, Plaintiff did not enter into other marketing ventures with similar marketing companies, like Defendant.

49. Plaintiff has been damaged by having to expend substantial time and resources due to the failures and unfulfilled promises of Defendant.

50. Defendant's conduct is a direct and proximate cause of the damages incurred by Plaintiff.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

**WHEREFORE,** Plaintiff, Display Points Group, Inc., dba Display Points Network, a Delaware corporation demands judgment against Defendant, DC Media & Marketing dba DC Sales, a Nevada corporation, as follows:

> (a) for damages equal to the $250,000 initial payment, plus interest, damages, reasonable attorneys' fees and costs, and other expenses and charges;
>
> (b) compensatory damages; and
>
> (c) for such other and further relief as is equitable, appropriate and just.

## COUNT FIVE – INJUNCTIVE RELIEF

51. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length.

52. As the Agreement has been terminated by Plaintiff, Defendant should be barred from any further marketing efforts as set forth in the Agreement.

**WHEREFORE,** Plaintiff, Display Points Group, Inc., dba Display Points Network, a Delaware corporation demands judgment against Defendant, DC Media & Marketing dba DC Sales, a Nevada corporation, as follows:

> (a) barring any further marketing efforts by Defendant and any affiliated entities on behalf of Plaintiff;
>
> (b) barring any further marketing efforts by Defendant and any affiliated entities to any previously provided Venues that Plaintiff may have supplied;
>
> (c) attorney fees and costs; sand
>
> (d) for such other and further relief as is equitable, appropriate and just.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

## COUNT SIX – LOSS PROFITS

53. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length.

54. Due to Defendant's failure to perform pursuant to the Agreement, Plaintiff has suffered extensive loss of business income.

**WHEREFORE,** Plaintiff, Display Points Group, Inc., dba Display Points Network, a Delaware corporation demands judgment against Defendant, DC Media & Marketing dba DC Sales, a Nevada corporation, as follows:

    (a) loss profits;

    (b) damages, plus interest, damages, reasonable attorneys' fees and costs, and

      other expenses and charges; and

    (c) for such other and further relief as is equitable, appropriate and just.

      STARK & STARK
      A Professional Corporation

      By: _____
        THOMAS S. ONDER

Dated: August 24, 2012

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, it is hereby stated that the matter in controversy is not subject to any other action pending in any other Court or of a pending arbitration proceeding to the best of my knowledge.

By: _____
THOMAS S. ONDER

Dated: August 24, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2012, the foregoing document was filed with the Clerk of the Court, U.S. District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007 in accordance with the Federal Rules of Civil Procedure and/or U.S. District Court's Local Rules and/or U.S. District Court's Rules on Electronic Service and was caused to be served, via regular mail and facsimile, to:

DC Media & Marketing dba DC Sales, Inc.
5524 South Fort Apache Road, Suite 110
Las Vegas, NV 89148

By: _____
THOMAS S. ONDER

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

Dated: August 24, 2012

-11-

# EXHIBIT A

# OPERATING AGREEMENT

# FOR

## *BK Sems Media, LLC*

## *DBA: Display Points Network*

# OPERATING AGREEMENT

## Table of Contents

**1. Organizational Matters** ........................................................................................................... 1
    1.1    Definitions ............................................................................................................. 1
    1.2    Formation. .............................................................................................................. 1
    1.3    Name. ..................................................................................................................... 1
    1.4    Term. ...................................................................................................................... 1
    1.5    Office and Agent. ................................................................................................... 2
    1.6    Purpose of Company. ............................................................................................. 2
    1.7    Addresses. .............................................................................................................. 2

**2. Capital Contributions** ............................................................................................................ 2
    2.1    Capital Requirements ............................................................................................. 2
    2.2    Capital Contributions. ............................................................................................ 3
    2.3    Additional Capital. ................................................................................................ 3
    2.4    Capital Accounts. ................................................................................................... 3
    2.5    Withdrawal and Return of Capital. ........................................................................ 3
    2.6    Interest Provision ................................................................................................... 4
    2.7    Priority of Returns. ................................................................................................ 4

**3. Members** ................................................................................................................................ 4
    3.1    Limited Liability. ................................................................................................... 4
    3.2    Admission of Additional Members ........................................................................ 4
    3.3    Withdrawals or Resignations. ................................................................................ 4
    3.4    Termination of Membership Interest. .................................................................... 4
    3.5    Members Are Not Agents. ...................................................................................... 4
    3.6    Voting Rights. ........................................................................................................ 4
    3.7    Rights of Assignees ............................................................................................... 5

**4. Management and Control of the Company** ........................................................................... 5
    4.1    Management of the Company. ................................................................................ 5
    4.2    Election of Manager(s). ......................................................................................... 5
    4.3    Powers of Manager. ............................................................................................... 6
    4.4    Performance of Duties; Liability of Manager. ....................................................... 7
    4.5    Devotion of Time ................................................................................................... 7
    4.6    Competing Activities. ............................................................................................ 7
    4.7    Payments to Manager & Exceptional Profits ........................................................ 7
    4.8    Execution of Documents ........................................................................................ 8

**5. Distributions, Allocations and Tax Matters** ......................................................................... 9
    5.1    Current Distributions. ............................................................................................ 9
    5.2    Allocations of Profits and Losses. ......................................................................... 9
    5.3    Tax Matters Generally. .......................................................................................... 9
    5.4    Distributees. ........................................................................................................... 10

|      | 5.5 | Form of Distribution. | 10 |
|      | 5.6 | Restriction on Distributions. | 10 |
|      | 5.7 | Return of Distributions. | 10 |

| 6. | | **Accounting, Records, Reporting by Members** | 11 |
|    | 6.1 | Books and Records. | 11 |
|    | 6.2 | Delivery to Members and Inspection. | 11 |
|    | 6.3 | Tax Returns. | 12 |
|    | 6.4 | Financial and Other Information. | 12 |
|    | 6.5 | Filings. | 12 |
|    | 6.6 | Bank Accounts. | 12 |
|    | 6.7 | Accounting Decisions and Reliance on Others | 12 |

| 7. | | **Transfer and Assignment of Interests** | 13 |
|    | 7.1 | Transfer and Assignment of Interests. | 13 |
|    | 7.2 | Further Restrictions on Transfer of Interests. | 13 |
|    | 7.3 | Substitution of Members. | 13 |
|    | 7.4 | Permitted Transfers. | 13 |
|    | 7.5 | Effective Date of Permitted Transfers. | 14 |
|    | 7.6 | Rights of Legal Representatives. | 14 |
|    | 7.7 | No Effect to Transfers in Violation of Agreement. | 14 |

| 8. | | **Buy-Out Provisions** | 15 |
|    | 8.1 | Buy-Out Events | 15 |
|    | 8.2 | Purchase Price. | 15 |
|    | 8.3 | Notice of Intent to Purchase | 16 |
|    | 8.4 | Election to Purchase Less Than All of the Selling Member's Interest | 16 |
|    | 8.5 | Payment of Purchase Price. | 16 |
|    | 8.6 | Closing of Purchase of Selling Member's Interest. | 17 |
|    | 8.7 | Other Events Giving Rise to Purchase. | 17 |
|    | 8.8 | Purchase Terms Varied by Agreement. | 18 |

| 9. | | **Dissolution and Winding Up** | 18 |
|    | 9.1 | Dissolution. | 18 |
|    | 9.2 | Certificate of Dissolution. | 18 |
|    | 9.3 | Winding Up. | 18 |
|    | 9.4 | Distributions in Kind. | 18 |
|    | 9.5 | Order of Payment Upon Dissolution | 19 |
|    | 9.6 | Compliance with Regulations. | 19 |

| | 9.7 | Limitations on Payments Made in Dissolution. | 19 |
| | 9.8 | Certificate of Cancellation. | 20 |
| | 9.9 | No Action for Dissolution. | 20 |

**10. Indemnification and Insurance** ... 20

    10.1 Indemnification of Agents. ... 20

    10.2 Insurance. ... 20

    10.3 Indemnity of Guarantors. ... 20

**11. Investment Representations** ... 23

    11.1 Preexisting Relationship or Experience. ... 23

    11.2 No Advertising. ... 23

    11.3 Investment Intent. ... 23

    11.4 Residency. ... 23

    11.5 Entity Investors. ... 23

**12. Miscellaneous.** ... 24

    12.1 Complete Agreement. ... 24

    12.2 Binding Effect. ... 24

    12.3 Parties in Interest ... 24

    12.4 Construction. ... 24

    12.5 Jurisdiction. ... 24

    12.6 Severability. ... 24

    12.7 Additional Documents and Acts. ... 24

    12.8 Notices. ... 25

    12.9 Amendments. ... 25

    12.10 Reliance on Authority of Person Signing Agreement ... 25

    12.11 No Interest in Company Property; Waiver of Action for Partition ... 25

    12.12 Multiple Counterparts. ... 25

    12.13 Attorney Fees. ... 25

**Schedules & Exhibits**

**OPERATING AGREEMENT**

**FOR**

**BK SEMS MEDIA, LLC**
**A CALIFORNIA LIMITED LIABILITY COMPANY**
**DBA: Display Points Network**

     THIS OPERATING AGREEMENT is made and entered into as of June _____, 2011, by and among BK Sems USA, Inc., and Display Points Group, Inc. (hereinafter "Members" as listed and specified in Exhibit C attached hereto), with reference to the following facts:

     A.     Articles of Organization for BK Sems Media, LLC (the "Company"), a limited liability company under the laws of the State of California, are filed with the California Secretary of State.

     B.     The parties desire to adopt and approve an operating agreement for the Company.

     NOW, THEREFORE, the parties by this Agreement set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

**A G R E E M E N T**

**1. Organizational Matters**

     **1.1**     **Definitions.** Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule 1.1 hereto.

     **1.2**     **Formation.** Pursuant to the Act, the Members have formed a limited liability company under the laws of the State of California by causing the Articles to be filed with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

     **1.3**     **Name.** The official legal name of the Company shall be "BK Sems Media, LLC" however, the business of the Company will be conducted under the name of "Display Points Network" in compliance with all applicable laws, or any other name that the Manager and Members deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable.

     **1.4**     **Term.** The term of this Agreement shall commence on the date hereof and shall continue until terminated in accordance with the provisions of this Agreement.

**1.5     Office and Agent.** The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

**1.6     Purpose of Company.** The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act for the purpose of generating revenue for the Company's Members and sharing in accordance with Exhibit A attached hereto. Notwithstanding the foregoing, without the consent of the Members the Company shall not engage in any business other than the following:

      **A.**     sales and distribution of certain digital display products and services,

      **B.**     such other activities related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager and Members to carry on the foregoing business.

**1.7     Addresses.** The initial addresses of the Company's Managers are: David Hazzard: 8901 Harrell Avenue Treasure Island, Florida 33706 and BK Sems USA at 501 South Idaho Street Suite 290 La Habra California 90631-6047. The address of the Manager(s) may be changed from time to time.

## 2. Capital Contributions

### 2.1     Contribution Requirements.

The Initial Members shall, promptly following the execution of this Agreement, contribute to the capital and assets of the Company those assets specified on Exhibit A attached hereto. BK Sems USA, Inc. shall amend Exhibit A from time to time to reflect any future capital contribution made by any Participant. Persons hereafter admitted as Members of the Company shall make such contributions of cash (or promissory obligations), property or services to the Company as shall be determined by the Manager and the Member making the contribution in their sole discretion at the time of each such admission.

### 2.2     Capital Contributions.

**2.2.1**     On an as-needed basis, as determined by the Manager, Manager may elect to make cash and/or non-cash capital contributions to the extent needed to satisfy the obligations of the Company. Manager shall receive a credit to its Capital Account for all amounts contributed pursuant to this Section 2.2.1 as agreed upon in writing by BK Sems USA, Inc. For clarity, regular operating costs and expenses of the Company's business shall be the responsibility of Dave Hazzard and Display Points Group, Inc. and shall not be deemed Capital Contributions.

**2.3     Additional Capital.** No Member shall be required to make any additional Capital Contributions. To the extent approved by the Manager and the Members, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire, and if the Manager determines that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business. In that event, the Members shall have the opportunity, but not the obligation, to participate in such

2

additional Capital Contributions on a pro rata basis in accordance with their Capital Percentages.

### 2.4 Capital Accounts.

**2.4.1 Maintenance of Capital Accounts.** The Managers shall establish and maintain an individual Capital Account for each Member. BK Sems USA, Inc. shall determine and maintain each Capital Account in accordance with Section 1.704-1(b)(2)(iv) of the Regulations.

**2.4.2 Revaluation of Capital Accounts.** Upon the contribution to the Company by a new or existing Member, or the Distribution by the Company to a retiring or continuing Member, of any money or property (other than a de minimis amount), as consideration for an interest in the Company, the Manager shall allocate among the Members any adjustment of the Gross Asset Values required by Section 9(e)(ii) or Section 9(e)(iii) of Schedule 5.2 for purposes of adjusting their Capital Accounts, in the same manner as other items of gain or loss are allocated pursuant to this Agreement.

**2.4.3 Effect of Transfer.** If a Member transfers his or her Membership Interest in accordance with this Agreement, such Member's Capital Account shall carry over to the new owner of such Membership Interest pursuant to Section 1.704-1(b)(2)(iv)(1) of the Regulations.

**2.5 Withdrawal and Return of Capital.** No Member shall be entitled to withdraw or to demand the return of any or all of that Member's Capital Contribution, except as specifically provided in this Agreement.

**2.6 Interest Provision.** Except as otherwise provided in this Agreement as amended, no Member shall be entitled to receive any interest on his or her Capital Contributions. Based on each Member's Unrecovered Capital invested, the Company shall keep a record credited to the Member and any repayments of Capital Contributions and profits. The record shall be maintained in a manner prescribed by the Manager in consultation with the Company's accounting and tax advisors. Repayments of Unrecovered Capital to Members shall be made in priority to any other payments made by the Company only to the extent Company has actual Net Cash Flow after the payment of fees and expenses, and only if agreed upon by BK Sems USA, Inc in writing.

**2.7 No Priority Return.** Unless otherwise agreed in writing, no Member shall have priority over any other Member regarding the return of a Capital Contribution.

### 3. Members

**3.1 Limited Liability.** Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

**3.2 Admission of Additional Members.** The Manager, with the approval of the Members, may admit to the Company additional Members. Any additional Members shall obtain Membership Interests and will participate in the management, Profit and Loss allocations consistent with the terms of this Agreement, and Distributions of the Company on such terms as are determined by the Manager and approved by the Members. Notwithstanding the foregoing, Assignees may only be admitted as substitute Members in accordance with Section 7.3 below.

**3.3 Withdrawals or Resignations.** No Member may unilaterally withdraw or resign from the Company. A withdrawal in violation of this Section shall constitute a breach of the Agreement by the

withdrawing Member, and shall result in the termination of that Member's interest pursuant to Section 3.4 and the possible repurchase of that Member's interest pursuant to Article 8 below.

      **3.4    Termination of Membership Interest.** Upon the Transfer or attempted Transfer of a Member's Membership Interest in violation of this Agreement or the withdrawal of a Member in violation of this Agreement, the Membership Interest of a Member shall be terminated by the Manager and thereafter that Member shall be an Assignee only unless such Membership Interest shall be purchased by the Company and/or the remaining Members as provided herein. Each Member acknowledges and agrees that such termination or purchase of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

      **3.5    Members Are Not Agents.** Pursuant to Section 4.1 and the Articles, the management of the Company is vested in the Manager. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act. No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Manager, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

      **3.6    Voting Rights.** Except as expressly provided in this Agreement or the Articles, Members shall have no voting, approval or consent rights. Except as otherwise provided herein, in all matters in which a vote, approval or consent of the Members is required under this Agreement, a vote, consent or approval of a Majority Interest of Members shall be required to authorize or approve such act. Except as otherwise provided herein, any Member who is the subject of a Purchase Event shall not be entitled to vote or consent to any matter coming before the Members for their approval. In the event of a tie or deadlocked vote on any matter, BK Sems USA, Inc shall have the right to cast the deciding vote.

      **3.7    Rights of Assignees.** Upon an assignment of a Member's Economic Interest, with or without violation of this Agreement , such Member's capital account (to the extent of the assigned Economic Interest) shall carry over to the Assignee, pursuant to Section 1.704-1(b)(2)(iv)(1) of the Regulations. All references to Members in this Agreement shall be deemed to also refer to Assignees where the context so requires. An Assignee shall have Economic Rights, but shall not have any other rights of a Member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

## 4. Management and Control of the Company

**4.1    Management of the Company.** The business, property and affairs of the Company shall be managed exclusively by the Managers. Except for situations in which the approval of the Members or both Managers is expressly required by the Articles or this Agreement BK Sems USA, Inc. acting as a Manager (in consultation with Dave Hazzard) shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

**4.2    Election of Manager(s).**

**4.2.1 Number, Term, and Qualifications.** The Company shall initially have two Managers: Dave Hazzard (Sales Operations Manager) and BK Sems USA, Inc. (Manufacturing & Products Manager). The Manager(s) shall hold office until resignation or removal. A Manager need not be a Member of the Company.

**4.2.2 Resignation.** A Manager may resign at any time by giving written notice to the Members. The resignation of one of the initial Managers shall not affect the authority of the other initial Manager and shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

**4.2.3 Removal.** A Manager may be removed only with cause by the affirmative vote or written consent of BK Sems USA, Inc. and Members holding a Majority Interest. Any removal shall be without prejudice to the rights, if any, of the Manager under any employment contract and, if the Manager is also a Member, shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member. For purpose of this Section, "cause" shall mean fraud, gross negligence, willful misconduct, embezzlement or a breach of such Manager's obligations under this Agreement or any employment contract with the Company.

**4.2.4 Vacancies.** Any vacancy occurring for any reason in the office of Manager may be filled by the affirmative vote or written consent of BK Sems, USA, Inc.

**4.3    Powers of Manager.**

**4.3.1 Powers of Manager.** Without limiting the generality of Section 4.1, but subject to Section 4.3.2 and to the express limitations set forth elsewhere in this Agreement, a Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf of and in the name of the Company all of the powers described in Corporations Code Section 17003.

**4.3.2 Limitations on Power of Manager.** Notwithstanding any other provisions of this Agreement, the Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of BK Sems USA, Inc.:

   (i)    The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a 12-month period, except: a) to acquire properties or rights for the Company; or b) effect the orderly liquidation and winding up

of the business of the Company upon its duly authorized dissolution;

(ii)     Or the merger of the Company or the conversion of the Company into another limited liability company, a corporation, a general partnership or limited partnership or any other entity; and in no event shall a Member be required to become a general partner in a merger or a conversion into a general partnership or limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.The establishment of different classes of Members.

(iii)    An alteration of the primary purpose of the Company as set forth in Section 1.6.

(iv)     Transactions between the Company and the Manager or one or more of his Affiliates, or transactions in which the Manager or one or more of his Affiliates, has a material financial interest.

(v)      Without limiting subsection (v), the lending of money by the Company to any Manager or Member.

(vi)     A decision to compromise the obligation of a Member to make a Capital Contribution or return money or property paid or distributed in violation of the Act.

(vii)    Any act which would make it impossible to carry on the ordinary business of the Company.

(viii)   The confession of a judgment against the Company.

(ix)     Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members.

**4.4     Performance of Duties; Liability of Manager.** A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.

**4.5     Devotion of Time.** A Manager is not obligated to devote all of his, her or its time or business efforts to the affairs of the Company. A Manager shall devote whatever time, effort, and skill as he, she or it deems appropriate for the operation of the Company.

**4.6     Competing Activities.** A Manager and its officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. A Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. A Manager shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Manager and its Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Manager's time. The Members hereby waive any and all rights and claims which they may

6

otherwise have against the Manager and its officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any of such activities.

   **4.7    Payments to Manager.** Except as specified in this Agreement, no Manager or Affiliate of a Manager is entitled to remuneration for services rendered or goods provided to the Company. The Manager and its Affiliates shall receive only the following payments for Management services:

   **4.7.1 Management Fee.** As compensation for carrying out its duties as Manager of the Company, the Company may elect to pay to Manager such amounts as are commercially reasonable for the duties performed and the performance of the Company. Annual or periodic compensation shall be determined by BK Sems USA, Inc. and ratified by vote of the Members. The Members acknowledge that while Manager begins earning the Management Fee before any sales occur, actual payment of the Management Fee may be made at such times and in such amounts as may be determined by BK Sems USA, Inc. in its sole discretion based on projections, sales, and the availability of funds.

   **4.7.2 Expenses.** The Company shall reimburse the Manager and his Affiliates for the actual cost of goods and materials used for or by the Company. The Company shall also pay or reimburse the Manager or his Affiliates for reasonable organizational expenses (including, without limitation, legal, drafting and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement. For clarity, reimbursement for these organizing expenses to BK Sems USA, Inc. shall not exceed $30,000.

   **4.7.3 Character of Fees and Expenses.** All fees payable and expenses reimbursable pursuant to this Section 4.7 shall be considered an expense of the Company and not a Distribution to the Manager.

   **4.8    Execution of Documents.**

   **4.8.1 Agency Authority of Manager.** Subject to Section 4.3.2, the Managers (BK Sems USA, Inc. and Display Points Group, Inc, acting together, are authorized to sign or endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company for any check, payment or obligation in excess or $2,500. The Managers, acting together , shall be authorized to sign contracts and obligations on behalf of the Company.

   **4.8.2 Form of Signatures.** All notes, bills, checks or other negotiable or nonnegotiable securities or obligations payable to the Company or drawn upon the Company, as well as any and all other documents by the Company, shall be endorsed, signed and/or executed in the name of and on behalf of the Company by the Manager as follows:

By: _____

        David Hazzard,
        As a Manager of BK
        Sems Media, LLC  Dba:
        Display Points Network

AND

        BK Sems Media, LLC, a California limited liability
        company, dba: Display Points Network

        By: BK Sems USA, Inc., its Manager

7

By: _____
     Keven H. Kim,
     CEO

## 5. Distributions, Allocations and Tax Matters

### 5.1   Current Distributions.

Distribution of Adjusted Gross Revenue.

Subject to specific project capital requirements and written approval of BK Sems USA's Capital Board, the Managers shall establish a written Adjusted Revenue-sharing arrangement for various projects from time to time.

**5.1.1 Member's Distribution Share.** Subject to applicable law and any limitations contained elsewhere in this Agreement, Member's Distributions Share (based on Company's EBITDA) , if any, shall be distributed not later than 60 days after the end of each calendar year in the following order and priority:

(a)  First, to each Member in proportion to their Capital Percentages until cumulative distributions pursuant to this Section 5.1.1(a) equal each such Member's Priority Return.

(b)  The balance, if any, shall be distributed to the Members in proportion to their respective Percentage Interests as shown in Exhibits B attached hereto.

### 5.2   Allocations of Profits and Losses.

**5.2.1 Profits.** After giving effect to the special allocations provided for in Schedule 5.2, Profits for any Fiscal Year shall be allocated among the Members and credited to their respective Capital Accounts and as agreed upon in writing by BK Sems USA, Inc. as follows:

(a)  First, one hundred percent (100%) to Members to whom Losses have been allocated pursuant to Section 5.2.2 in proportion to their Capital Percentages until the aggregate Profits allocated to such Members pursuant to this Section 5.2.1(a) for such Fiscal Year and all previous Fiscal Years is equal to the aggregate Losses allocated to such Members pursuant to Section 5.2.2 for all previous Fiscal Years.

(b)  Second, to each Member in proportion to his or her Capital Percentage until the aggregate amount allocated to each such Member under this Section 5.2.1(b) equals the aggregate amounts previously distributed to each such Member pursuant to Section 5.1.1(a).

(c)  Third, to each Member in proportion to their Percentage Interest.

**5.2.2 Losses.** After giving effect to the special allocations provided for in Schedule 5.2, Losses for each Fiscal Year shall be allocated among the Members in proportion to their Capital Percentages or as otherwise determined by BK Sems USA, Inc.

### 5.3   Tax Matters Generally. 
The Company elects to be classified as a partnership for Federal and state income tax purposes, and no election to be classified as an association taxable as a corporation shall be made without the unanimous written consent of the Members. Taxable Income and Losses shall be allocated in a manner which is consistent with the allocation of Profits and Losses as provided in Section 5.2

8

hereof, taking into account the adjustments described by Section 1.704-1(b)(2)(iv)(g) of the Regulations. The Members are aware of the income tax consequences of the allocations made by this Article 5 and hereby agree to be bound by the provisions of this Article 5 in reporting their shares of Taxable Income and Loss for income tax purposes. Additional provisions relating to tax and accounting matters are set forth in the attached Schedule 5.2.

  **5.4  Distributees.** All Distributions pursuant to Section 5.1 shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such Distributions are made on the actual date of distribution. Subject to Section 5.6, neither the Company nor any Manager shall incur any liability for making Distributions in accordance with Section 5.1 or Section 9.5.

  **5.5  Form of Distribution.** A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any Distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a Distribution of any asset in kind in lieu of a proportionate Distribution of money being made to other Members. Except upon dissolution and the winding up of the Company, no Member may be compelled to accept a Distribution of any asset in kind.

**5.6 Restriction on Distributions.**

    **5.6.1 Insolvency.** No Distribution shall be made if, after giving effect to the distribution: (i) the Company would not be able to pay its debts as they become due in the usual course of business; or (ii) the Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

    **5.6.2 Determination.** The Manager may base a determination that a Distribution is not prohibited on any of the following: (i) financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances; (ii) a fair valuation; or (iii) any other method that is reasonable in the circumstances.

    **5.6.3 Liability.** A Member or Manager who votes for a Distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the Distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 5.6 or Section 9.5. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the Distribution was made in violation of this Agreement or the Act.

  **5.7  Return of Distributions.** Except for Distributions made in violation of the Act or this Agreement, no Member or Assignee shall be obligated to return any Distribution to the Company or pay the amount of any Distribution for the account of the Company or to any creditor of the Company. The amount of any Distribution returned to the Company by a Member or Assignee or paid by a Member or Assignee for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Assignee.

## 6. Accounting, Records, Reporting by Members

**6.1    Books and Records.** The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

   (i)    A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Assignee;

   (ii)    A current list of the full name, place of business and or residence address of each Manager;

   (iii)    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

   (iv)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the three most recent taxable years;

   (v)    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

   (vi)    Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

   The Company's books and records, if any, as they relate to the internal affairs of the Company for the current and past four Fiscal Years.

**6.2    Delivery to Members and Inspection.**

   **6.2.1 Delivery Rights.** Upon the request of any Member or Assignee for purposes reasonably related to the interest of that Person as a Member or Assignee, the Manager shall promptly deliver to the requesting Member or Assignee, at the expense of the Company, a copy of the information required to be maintained under clauses (i), (ii) and (iv) of Section 6.1, and a copy of this Agreement.

   **6.2.2 Inspection Rights.** Each Member, Manager and Assignee has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Assignee, to: (i) inspect and copy during normal business hours any of the Company records described in clauses (i) through (vii) of Section 6.1; and (ii) obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

   **6.2.3 Requests by Agents and Attorneys.** Any request, inspection or copying by a Member or Assignee under this Section 6.2 may be made by that Person or that Person's agent or attorney.

**6.2.4 Documents Executed Under Power.** The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by a Manager pursuant to a power of attorney from the Member.

**6.3** **Tax Returns.** The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Assignees' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Assignee within 90 days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has 35 or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

**6.4** **Financial and Other Information.** The Manager shall provide such financial and other information relating to the Company in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to in which the Company owns, directly or indirectly, an equity interest, including any filings by the Company under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

**6.5** **Filings.** The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all information statements and reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If a Manager required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the appropriate federal or state regulatory or administrative body.

**6.6** **Bank Accounts.** The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

BK SEMS Media LLC – Representing Financial Institute shall be Wells Fargo Bank

Account for Checking and Savings already positioned for business as of the date first indicated above for this Operating Agreement.

**6.7** **Accounting Decisions and Reliance on Others.** All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

# 7. Transfer and Assignment of Interests

**7.1    Transfer and Assignment of Interests.** No Member shall be entitled to Transfer or assign all or any part of his or her Membership Interest, except with the prior written consent of BK Sems USA, Inc.acting as the Manager, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as BK Sems USA, Inc. may determine in its sole discretion. After the consummation of any Transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with all the terms and provisions of this Agreement.

**7.2    Further Restrictions on Transfer of Interests.** In addition to other restrictions found in this Agreement, no Member shall Transfer all or any part of his or her Membership Interest: (i) without compliance with applicable securities laws, as determined by the Manager in its sole discretion; (ii) if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all other Membership Interests sold or exchanged in the preceding 12 consecutive months prior thereto, would cause the termination of the Company under the Code; or (iii) if as a result of such Transfer (when accumulated with any prior Transfers) any or all of the real property then held by the Company is subject to reappraisal for property tax purposes under Section 64 of the California Revenue and Taxation Code, or successor provisions, unless such Member obtains the prior written consent of the Manager to such Transfer, which consent shall expressly acknowledge that the Transfer may result in the reappraisal of any or all of the Company's real property for property tax purposes. The foregoing shall not apply to any Transfer on account of the death of the Member or the Member's spouse. Any Transfer in violation of this Section 7.2 shall be null and void and the purported transferee shall not become either a Member or an Assignee. Each Member shall indemnify and hold harmless the Company and each remaining Member for any injury, damages, loss, increased tax or assessment, cost or expense (including attorney's fees and costs of suit), arising out of the Member's breach of this Section 7.2.

**7.3    Substitution of Members.** A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 relating to the required consent of the Manager or non-transferring Members, as the case may be , securities and tax requirements hereof are met, (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement, and, if such person is an individual who is married and not legally separated from his spouse, causes his or her spouse to execute a consent of spouse in the form required by the Manager, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

**7.4    Permitted Transfers.**

**7.4.1 Transfers to Family Trusts.** Notwithstanding any of the provisions of Section 7.1 to the contrary, but subject to compliance with Section 7.2, any Transfer by a Member of his or her Economic Interest to a Family Trust shall be permitted with the consent of BK Sems USA, Inc.. Nothing contained in this Section 7.4.1 shall be construed as permitting the Transfer of any part of a Member's Membership Interest other than the transferring Member's Economic Interest. Any further Transfers of the transferor Member's Membership Interest or any part thereof by way of Transfers from the trust to any person other than the transferor Member shall be subject to the restrictions set forth in Section 7.1. For purposes of the foregoing, the transferor's Membership Interest shall be deemed transferred at such time as the trust estate or any part thereof become irrevocable and the transferor's Membership Interest or any part thereof is transferred to or otherwise becomes part of the trust estate of an irrevocable trust.

**7.4.2 Incomplete Transfers.** Notwithstanding the consummation of a Transfer of a Member's Economic Interest pursuant to Section 7.4.1, the transferring Member shall remain a Member, and shall possess all of the rights not assigned to the Assignee pursuant to Section 7.4.1. Further, it is specifically agreed that the transferring Member shall continue to be considered the owner of the entire Membership Interest (including the assigned Economic Interest) for purposes of Article 8 of this Agreement. As a result, any Purchase Event occurring with respect to the transferring Member shall give rise to an obligation or option, as the case may be, on the part of the Company and/or the remaining Member to purchase the transferred Economic Interest pursuant to Article 8 of this Agreement. In connection with any such purchase, the Assignee shall be entitled to receive the entire purchase price for the entire Membership Interest held by the transferring Member and the Assignee, and all remaining rights and interests retained by the Member that immediately before the Transfer were associated with the transferred Economic Interest shall automatically terminate at the time of the closing of such purchase.

**7.5     Effective Date of Permitted Transfers.** Any permitted Transfer of all or any portion of a Membership Interest shall be effective as of the date determined pursuant to Schedule 5.2 following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such Transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on Transfer imposed by this Agreement.

**7.6     Rights of Legal Representatives.** If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an Assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

**7.7     No Effect to Transfers in Violation of Agreement.** Voluntary Transfers in violation of this Article 7 shall be null and void. Involuntary Transfers in violation of this Article 7 shall only be effective to the extent set forth in this Section. Upon any involuntary Transfer of a Membership Interest in violation of this Article 7, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Profits, Losses and Distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitleUpon and contemporaneously with any Transfer (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's entire Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company all remaining rights and interests retained by the Member that immediately before the Transfer were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member. Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article 7 is not unreasonable under the circumstances existing as of the date hereof.

## 8. Buy-Out Provisions

**8.1     Buy-Out Events.** Upon the occurrence of a Buy-Out Event, the Company and/or the Remaining Members shall have the option to purchase, and, in the event of the exercise of such option, the

Member whose actions or conduct resulted in the Buy-Out Event or such Member's legal representative ("**Selling Member**") shall sell, the Selling Member's Membership Interest ("**Selling Member's Interest**") as provided in this Article 8. If the Buy-Out Event is the transfer by a Member of that Member's Economic Interest in violation of this Agreement, then the Company and/or the Remaining Members shall have the option to purchase, and in the event of the exercise of such option, the Assignee of such interest shall be required to sell the Economic Interest formerly associated with the transferring Member's Membership Interest, in which event for purposes of this Article 8 the Assignee shall be deemed to be a Selling Member and the Economic Interest held by the Assignee shall be deemed to be a Selling Member's Interest.

      **8.2**    **Purchase Price.** The purchase price for the Selling Member's Interest shall be the Capital Account balance of the Selling Member as adjusted pursuant to Section 2.4.2; provided, however, that if the Selling Member or the Company, deems the Capital Account balance to vary from the fair market value of the Selling Member's Interest by more than 10%, such party shall be entitled to require an appraisal by providing notice of the request for appraisal within 60 days after the Buy-Out Event, or, if the Buy-Out Event is the death of a Member, within 60 days after the appointment of a personal representative of the deceased Member, whichever is later. In such event, the value of the Selling Member's Interest shall be determined by an independent appraiser jointly selected by the Company and the Selling Member; provided, that if the Company and the Selling Member fail to agree upon a single appraiser within 10 days after the notice or appraisal, the value of the Selling Member's Interest shall be determined by three independent appraisers, one selected by the Selling Member, one selected by the Company, and one selected by the two appraisers so named. In the event that three appraisers are appointed, the fair market value of the Selling Member's Interest shall be the average of the two appraisals closest in amount to each other. In the event the fair market value is determined to vary from the Capital Account balance by less than 10%, the party requesting such appraisal shall pay all expense of all the appraisals incurred by the party offering to enter into the transaction at the Capital Account valuation. In all other events, the party requesting the appraisal shall pay one-half of such expense and the other party shall pay one-half of such expense. Notwithstanding the foregoing, if the purchase event is a termination of a Membership Interest pursuant to Section 3.4 which results from a breach of this Agreement by the Selling Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

      **8.3**    **Notice of Intent to Purchase.** Within 30 days after the Buy-Out Event, or, if the Buy-Out Event is the death of a Member, within 30 days after the appointment of a personal representative of the deceased Member, whichever is later, each Remaining Member shall notify the Manager in writing of his or her desire to purchase a portion of the Selling Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Selling Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Selling Member's Interest in the same proportion that the Capital Percentage of the Remaining Member bears to the aggregate of the Capital Percentages of all of the Remaining Members electing to purchase the Selling Member's Interest.

      **8.4**    **Election to Purchase Less Than All of the Selling Member's Interest.** If any Remaining Member elects to purchase none or less than all of his or her pro rata share of the Selling Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share. If the Remaining Members fail to purchase the entire interest of the Selling Member, the Company shall have the option to purchase any such remaining share at the purchase price determined in accordance with Section 8.2, which may be exercised by the Company by notifying the Selling Member of its desire to exercise such option within 10 days after the expiration of the 30-day period referred to in Section 8.3.

      **8.5**    **Payment of Purchase Price.** The purchase price shall be paid by the Company or the Remaining Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the Remaining Members:

(i)     The Company or the Remaining Members shall at the closing pay in cash the total purchase price for the Selling Member's Interest; or

The Company or the Remaining Members shall pay at the closing 20% of the purchase price in which case the balance of the purchase price shall then be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing. The unpaid principal balance shall accrue interest at the current applicable federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation to pay the balance due shall be evidenced by a promissory note, and if purchased by a Remaining Member, secured by a pledge of the Membership Interest being purchased.

**8.6     Closing of Purchase of Selling Member's Interest.** The closing for the sale of a Selling Member's Interest pursuant to this Article 8 shall be held at 10:00 a.m. at the principal office of Company no later than 60 days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Selling Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Selling Member's Interest. The Selling Member, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

**8.7     Other Events Giving Rise to Purchase.**

**8.7.1 Divorce.** Notwithstanding anything contained herein to the contrary, if, in connection with the divorce or dissolution of the marriage of a new individual Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to a Non-Member Spouse (an "Award"), then, notwithstanding that such Transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from the Non-Member Spouse the Membership Interest, or portion thereof, that was so transferred, and the Non-Member Spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth in Section 8.2 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the court award (the "Expiration Date"), the Remaining Members and the Company shall have the option to purchase from the Non-Member Spouse the Membership Interest or portion thereof, in which event the Non-Member Spouse shall be treated as a Selling Member and the provisions of Sections 8.3 through 8.6 shall be applicable, except that the notice of intent to purchase provided for in Section 8.3 above shall be provided within 30 days of the later of (i) the day following the Expiration Date, or (ii) the date of actual notice of the Award. For clarity, Paragraphs 8.7.1 and 8.7.2 (below) are applicable only to individual persons who may become Members and is not applicable to any company which is a Member.

**8.7.2 Death of Spouse.** Notwithstanding anything contained herein to the contrary, if, by reason of the death of a Non-Member Spouse, any portion of a Membership Interest is transferred to a transferee other than (1) the Member married to the Non-Member Spouse, or (2) a trust created for the benefit of the Member (or for the benefit of the Member and any combination between or among the Member and the Member's issue) in which the Member is the sole trustee and the Member, as trustee or individually possesses all of the voting rights in the Membership Interest, then the Member shall have the right to purchase the Membership Interest, or portion thereof from the estate or other successor of the Non-Member Spouse or transferee of the Non-Member Spouse, and the estate, successor, or transferee shall sell the Membership Interest or portion thereof at the price set forth in Section 8.2 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the "Expiration Date"), the Remaining Members and the Company shall have the option to purchase from the estate or other successor of the Non-Member Spouse the Membership Interest or portion thereof, in which event the estate or other successor shall be treated as a Selling Member and the provisions of Sections 8.3 through 8.6 shall be applicable, except that the

notice of intent to purchase provided for in Section 8.3 above shall be provided within 30 days of the later of (i) the day following the Expiration Date, or (ii) the date of actual notice of the death.

**8.8     Purchase Terms Varied by Agreement.** Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## 9. Dissolution and Winding Up

**9.1     Dissolution.** The Company shall not dissolve upon the death, bankruptcy, withdrawal, retirement, resignation, expulsion or dissolution of any Member. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up only upon the first to occur of the following:

> (i)     Upon the happening of any event of dissolution specified in the Articles;
>
> (ii)    Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;
>
> (iii)   Upon the affirmative vote or written consent of the Members; or
>
> (iv)    The sale of all or substantially all of the assets of Company.

**9.2 Certificate of Dissolution.** As soon as possible following the occurrence of any of the events specified in Section 9.1, the Manager, or if the Manager has wrongfully dissolved the Company, one or more Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.

**9.3     Winding Up.** Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Managers who have not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold shall cause the proceeds therefrom, to the extent sufficient, to be applied and distributed as provided in Section 9.5. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Managers or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

**9.4     Distributions in Kind.** Notwithstanding the foregoing provisions regarding the sale of the assets of the Company and the Distribution of the proceeds, with the approval of the Members the Manager may make Distributions in kind of the assets of the Company to the Members incident to the dissolution process. In such event, the Gross Asset Value of any

property distributed in kind shall be determined as provided in Section 9(e)(iii) of Schedule 5.2, and the difference between such Gross Asset Value and the book value of the property distributed in kind shall be treated as a gain or loss on the sale of the property and shall be allocated among the Members in proportion to their respective Economic Interests in the same manner as if the property had been sold.

### 9.5    Order of Payment Upon Dissolution.

**9.5.1 Distributions.** After determining that all the known debts and liabilities of the Company in the process of winding-up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members as follows:

(a)      First, to the extent that all Distributions provided for in Sections 5.1.1(a) and 5.1.1(b) above shall not have been completed, in accordance with the priorities set forth in Sections 5.1.1(a) and 5.1.1(b) above.

(b)      Next, in accordance with their positive Capital Account balances as determined after taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Such Distributions shall be made on or before the end of the taxable year during which liquidation of the Company occurs (or, if later, within ninety (90) days after the date of such liquidation).

**9.5.2 Adequate Provision for Debts.** The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment has been provided for by either of the following means:

(i)      Payment thereof has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Manager or Members to be adequate at the time of any Distribution of the assets pursuant to this Section 9.5; or

(ii)      The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 9.5 shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

### 9.6    Compliance with Regulations. All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Section 1.704-1(b)(2)(ii)(d) of the Regulations.

### 9.7    Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look solely to the assets of Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article 10.

**9.8    Certificate of Cancellation.** The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of and on a fatal prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

**9.9    No Action for Dissolution.** The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 9.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article 9, each Member hereby waives and renounces his or her right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 9.9 shall be monetary damages only (and not specific performance), and the damages may be offset against Distributions by the Company to which such Member would otherwise be entitled.

## 10. Indemnification and Insurance

**10.1 Indemnification of Agents.** The Company shall indemnify, defend and hold harmless any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems appropriate in its business judgment.

**10.2 Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

**10.3 Indemnity of Guarantors.**

**10.3.1 Proportionate Liability for Guarantees.** From time to time, one or more of the Members may guarantee debt incurred by the Company and/or provide environmental

indemnities for the Company. Any such guaranteed debt, any replacement financing that is guaranteed by Members, and any other indebtedness (regardless of amount) that is incurred by a Member is referred to herein as "Guaranteed Debt." It is agreed with regard to any Guaranteed Debt, although one or more individual Members may guarantee such indebtedness, to the extent of Members' Capital Account balances only, all Members shall have proportionate liability for any calls made upon such guarantee by the lender or other party in whose favor the guarantee runs (referred to for purposes of this Section 10.3 as the "Beneficiary").

## 10.3.2 Determination of Proportionate Share.

(i)     Except as provided in Section 10.3.2(H) and (iii) below, a Member's proportionate liability shall be in relation to the Capital Percentages of the Members at the time the Guaranteed Debt is incurred. Such reimbursement obligation shall remain a personal obligation of each such Member up to, but not exceeding, the amount of such Member's Capital Contribution, notwithstanding such Member's transfer of all or any part of his or her Membership Interest. A Member's percentage share of the calls by the Beneficiary, as determined pursuant to this Section 10.3.2, shall be referred to as his or her "Percentage Share."

(ii)     If a Member transfers his or her Membership Interest to one or more existing Members, then the liability of the transferring Member hereunder shall be eliminated, and the Percentage Share of each of the transferee Members shall be increased by the increase in such Member's Capital Percentage resulting from the transfer. Further, the transferees shall indemnify and hold the Selling Member harmless from any liability on his or her personal guaranty.

(iii)     If a Member transfers all or any part of his or her Membership Interest to one or more permitted transferees then the liability of the transferring Member hereunder shall be assumed by the permitted transferee to the extent of the Capital Percentage transferred. Further, the permitted transferee shall indemnify and hold the Selling Member harmless from any liability on his or her personal guaranty.

**10.3.3 Demand and Failure to Pay.** In the event that a Beneficiary makes demand for payment of the Guaranteed Debt on any Member, the Member who receives such demand shall give prompt written notice of such demand to each other Member. If one or more of the Members should fail to timely pay his or her Percentage Share of Beneficiary's demand (a "Defaulting Member") as required under Section 10.3.1, each Member who paid his or her Percentage Share of the Beneficiary's initial demand (a "Performing Member") shall have proportionate responsibility to promptly pay Beneficiary his or her proportionate share (the "Default Percentage Share") of the amount in default. Such payments by the Performing Members shall not excuse the failure of performance of the Defaulting Member nor the responsibility of the Defaulting Member to promptly reimburse the Performing Members for the payments they have made to Beneficiary on behalf of the Defaulting Member.

**10.3.4 Indemnity of Defaulting Member.** For purposes of the following provisions of this Agreement, the term "Defaulting Member" shall refer, as the context may apply, to an Member who fails to timely pay his or her Percentage Share to Beneficiary in accordance with Section 10.3.1 above, and to an Member who fails to pay his or her Default Percentage Share of the defaulted payment of a Defaulting Member pursuant to Section 10.3.3 above.

(i)    As to any default by a Member under Section 10.3.1 to pay his or her Percentage Share of any demand by the Beneficiary, each such Defaulting Member hereby agrees to indemnify, defend, protect and hold harmless each Performing Member for all payments made to the Beneficiary by the Performing Member that were the primary obligation of such Defaulting Member, and for the Defaulting Member's Percentage Share of any out-of-pocket expenses, including without limitation, attorneys' fees, accounting fees, court costs and other costs reasonably incurred to defend against the Beneficiary's demand or determine the merit of the Beneficiary's demand.

(ii)    As to any default by a Member under Section 10.3.3 to pay his or her Default Percentage Share of any demand by Beneficiary, each such Defaulting Member hereby agrees to indemnify, defend, protect and hold harmless each Performing Member for all payments made to Beneficiary by the Performing Member that were the obligation of the Defaulting Member under Section 10.3.3, and for the Defaulting Member's Default Percentage Share of any out-of-pocket expenses, including without limitation, attorneys' fees, accounting fees, court costs and other costs reasonably incurred to defend against the Beneficiary's demand or determine the merit of the Beneficiary's demand.

**10.3.5 Prompt Payment; Interest.** The Defaulting Member(s) shall, within ten (10) days after the Performing Obligator(s) have made written demand, pay all amounts required pursuant to Section 10.3.4. Such reimbursement obligation shall remain a personal obligation of the Defaulting Member(s) to the Performing Member(s), notwithstanding the Defaulting Member's transfer of all or any part of his or her Membership Interest. Such reimbursement shall include simple interest on the amount payable at the Prime Rate plus 2% per annum (or the maximum rate permitted by law, whichever is less) from the date(s) the Performing Member has made payments and/or incurred expenses that are reimbursable hereunder through the date of payment by the Defaulting Member to the Performing Member pursuant to this Section 10.3.5.

**10.3.6 Late Charge.**

(i) The Members acknowledge that if a Member fails to timely make payment to the Beneficiary of his or her Percentage Share of any demand as required pursuant to Section 10.3.1 above, or a Member fails to pay to other Performing Members his or her Default Percentage Share of a defaulted payment of a Defaulting Member pursuant to Section 10.3.3 above, that each Performing Member who makes a disproportionate payment to the Beneficiary (that is, a payment that exceeds such Member's Percentage Share of the Guaranteed Debt) may incur costs to make such payment, which costs may include costs of liquidating assets, transaction costs and taxes on gains from the sale of liquidated assets (collectively "Liquidation Costs"). If a Defaulting Member fails to make a required payment and a Performing Member then liquidates assets to make a payment on behalf of a Defaulting Member, disagreements could arise as to the choice of assets liquidated, the tax consequence thereof, and other matters relating to the Liquidation Costs. The Members desire to avoid possible future disputes regarding such matters and therefore have agreed to establish a late charge amount that takes into consideration the likely Liquidation Costs to a Performing Member.

## 11. Miscellaneous

**11.1 Complete Agreement.** This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and the Manager with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and the Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or the Manager or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

**11.2 Binding Effect.** Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

**11.3 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and the Manager and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**11.4 Construction.** All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

**11.5 Jurisdiction.** Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.8 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California.

**11.6 Severability.** If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**11.7 Additional Documents and Acts.** Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**11.8 Notices.** Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given: (i) to the Company at its principal office maintained pursuant to Section 1.5; (ii) to any Member at the address specified in Section 1.6
hereto, or such other current primary address of the Member maintained in the membership records of the Company; and (iii) to any Manager at the address specified in Section 1.6 hereto. Notwithstanding the foregoing, any party may, at any time by giving five days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

**11.9 Amendments.** All amendments to this Agreement must be in writing and signed by the Manager and must be approved by all of the Members.

**11.10 Reliance on Authority of Person Signing Agreement.** If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any

fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

**11.11 No Interest in Company Property; Waiver of Action for Partition.** No Member or Assignee has any interest in specific property of the Company. Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

**11.12 Multiple Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**11.13 Attorney Fees.** In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses. The Members acknowledge that the costs and expenses, including the Liquidation Costs, as actually incurred by each such Performing Member may be difficult and expensive to assertion. Accordingly, and particularly in light of the significant tax liabilities that may be incurred by a Performing Member to liquidate his or her assets to make payments that are the obligation of a Defaulting Member under this Agreement, the Members agree that a late charge of 10% shall be imposed on each Defaulting Member. Such late charge shall be assessed against the defaulted amount paid by such Performing Member to Beneficiary in the place of the Defaulting Member. Such late charge shall be in addition to the interest provided for in Section 10.3.5, shall be in lieu of attempting to calculate the actual Liquidation Costs, and shall be assessed against and paid by the Defaulting Member to each Performing Member. The Members agree that such late charge, while substantial, represents a fair and reasonable estimate of the costs and expenses that would be incurred by a Performing Member by reason of the failure of the Defaulting Member to make timely payment(s) hereunder. The Members acknowledge and further agree that such late charge is not intended to be, and shall not be considered or construed as, a penalty.

**IN WITNESS WHEREOF,** the Manager and all of the Members of BK Sems Media, LLC , a California limited liability company, have executed this Agreement, effective as of the date written above.

MANAGER(S):

BK Sems USA, Inc.

By:

_____

Keven H. Kim
BK Sems USA, as
Manager

23

MEMBERS:  (Attached Signature Page or Sign Below)


_____
Signature of Member


_____
Print Name of Signatory

Titled:

Address:

Member's Tax Identification Number:

## SCHEDULE 1.1

### Definitions

For purposes of the Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Schedule 1.1 shall have the meanings set forth elsewhere in the Agreement):

1.    **Act.** The Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000, et seq., as the same may be amended from time to time.

2.    **Adjusted Gross Revenue.** Gross Revenue calculated by subtracting sales commissions, legal costs, installation costs, advertising commissions, network administration costs, insurance costs, on-going hardware/software design, content management associated with Company's business operations.

3.    **Affiliate.** Any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

4.    **Agreement.** This Operating Agreement, as originally executed and as amended from time to time.

5.    **Articles.** The Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

6.    **Assignee.** The owner of an Economic Interest to the extent that such Economic Interest is not associated with any other rights of a Member, whether because the owner is a transferee of a Membership Interest who has not been admitted as a substitute Member, the owner's Membership Interest has been terminated pursuant to Section 3.4 of the Agreement, or otherwise.

7.    **Bankruptcy.** Any of the following events with respect to a Person: (a) the filing of an application by the Person for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets; (b) the entry of an order for relief with respect to the Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by the Person of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of the Person unless the proceedings and the person appointed are dismissed within 90 days; or (e) the failure by the Person generally to pay his or her debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

**7.      Capital Contributions.** The total value of cash and fair market value of property (including promissory notes or other obligation to contribute cash or property) contributed to the Company by Members.

**8.      Capital Percentage.** A Member's percentage of capital of the Company, determined by dividing such Member's Capital Account balance by the aggregate Capital Account balances of all Members.

**9.      Code.** The Internal Revenue Code of 1986 as amended, or any future federal tax code, and references to specific sections or subsections of such Code shall include corresponding sections or subsections of any future federal tax code.

**10.     Company.** BK Sems Media LLC, a California limited liability company doing business as: Display Points Network.

**11.     Corporations Code.** The California Corporations Code, as amended from time to time, and the provisions of succeeding law.

**12.     Distribution.** Any cash or property distributed to a Member with respect to the Member's Economic Interest, other than: (1) any payments for services rendered; (2) repayment of loans or advances made to the Company by a Member and loans from the Company to a Member; and (3) reimbursement of costs or expenses incurred by a Member on behalf of the Company.

**13.     EBITDA:** Earnings before interest, taxes, depreciation and amortization.

**14.     Economic Interest.** A Member's or Assignee's share of one or more of the Company's Profits, Losses, and Distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

**15.     Family Trust.** For purposes of this Agreement, a trust shall qualify as a "Family Trust" only: (i) if such trust is either for the exclusive benefit of the Member and/or his or her lineal ancestors, lineal descendants or spouse of such natural Person (a "Family Member") or provides for an income interest only for the spouse of such Member (either alone or in conjunction with one or more other of his or her Family Members) and all of the remaindermen of such trust are his or her Family Members; and (ii) if the Trustees of such trust are all members of a class consisting of the respective Member, his or her Family Members and corporate fiduciaries.

**16.     Fiscal Year.** (i) The period commencing on the effective date of this Agreement and ending on December 31, 2011, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article 5 of the Agreement.

**17.     Interest Rate.** The lesser of: (i) the lowest rate which may be utilized without incurring any "original issue discount" as defined in Section 1273 of the Code, which rate shall

be determined as of the date of the relevant date; or (ii) the highest legal rate of interest that may be charged without violating California's usury laws.

**17.** **Invested Capital.** The cash or the net fair market value of property contributed to the Company by a Member as capital when the Company is formed or at any later date pursuant to the terms of this Agreement.

**18.** **Majority Interest.** Members holding more than 50% of the Percentage Interests (excluding Members whose voting rights have been suspended pursuant to Section 3.6 of this Agreement or otherwise).

**19.** **Manager.** One or more managers. Specifically "Manager" shall mean the Persons named in Section 4.2 or any other persons that succeed any of them in that capacity.

**20.** **Member.** Each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles or this Agreement or is an assignee who has become a Member in accordance with Article 3 of the Agreement, and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

**21.** **Membership Interest.** A Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

**22.** **Net Cash Flow.** Net cash generated by the Company's business operations and miscellaneous sources, excluding Capital Contributions, but including Net Proceeds, after payment of cash expenditures, fees for services including to any Affiliates of the Manager , retirement of or provision for existing debt, debt service, operating expenses, amounts which the Manager deems necessary to place in reserves, amounts invested for Company purposes. "Net Cash Flow" shall be determined on a cash method of accounting and shall not be reduced by depreciation, amortization of intangible assets, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence hereof or pursuant to the first sentence of the succeeding paragraph.

**23.** **Net Proceeds.** The net cash proceeds from all sales, leases, other dispositions, and refinancing(s) of Company assets or property interests, less any portion thereof used to establish reasonable reserves, all as determined by Manager. "Net Proceeds" shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with the sale or other disposition of any Company assets or property.

**24.** **Non-Member Spouse.** The spouse or ex-spouse of a Member unless such spouse or ex-spouse is also a Member of the Company prior to the occurrence of an event described in Section 8.7.

**25.** **Percentage Interest.** A Member's positive Capital Account balance divided by the aggregate positive Capital Accounts of all the Members.

**26.** **Person.** An individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

**27.** **Priority Return.** A cumulative return on Unrecovered Capital equal to the rate (if any) in effect for each Member who has made a Capital Contribution pursuant to Section 2.2 or Section 2.3. Such Priority Return may be computed from the date of contribution and adjusted from time to time to reflect increases and decreases in Unrecovered Capital. The Priority Return shall be payable as specified in this Agreement from Distributable Cash and shall not create (a) a debt of the Company or the Manager to any Member to the extent that any such funds are not available for distribution, or (b) constitute a "guaranteed

payment" within the meaning of Section 707(c) of the Code. To the extent that the Company does not have sufficient Distributable Cash during any fiscal year of the Company in order for the Priority Return which shall accrue with respect to such fiscal year to be paid in full in accordance with this Agreement, then such unpaid portion shall accumulate and shall be paid in accordance with this Agreement from Distributable Cash which is available therefor with respect to any subsequent fiscal year. The term "Adjustment Date", as used herein, shall refer to the first day of every month beginning on or after the date of this Agreement until Unrecovered Capital is zero.

**28.** **Profits.** Company profits, or gross profits, as defined by reference to generally accepted accounting standards unless otherwise more specifically defined by the Manager in consultation with the Company's accounting and tax professionals.

**29.** **Purchase Event.** Termination of a Membership Interest pursuant to Section 3.4 or the death or Bankruptcy of a Member.

**30.** **Regulations.** Treasury Regulations under the Code, and references to specific sections or subsections of such Regulations shall include any successor provisions.

**31.** **Remaining Members.** All of the Members other than the Selling Member.

**32.** **Selling Member.** The meaning ascribed to it in Section 8.1.

**33.** **Selling Member's Interest.** Membership Interest held by the Selling Member.

**34.** **Transfer.** The terms "Transfer" or "Transferred" shall mean any sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition voluntarily or involuntarily, by operation of law, with or without consideration, or otherwise (including, without limitation, by way of intestacy, will, gift, bankruptcy, receivership, levy, execution, charging order or other similar sale or seizure by legal process) of all or any portion of any Membership Interest. Without limiting the generality of the foregoing, the sale or exchange of at least fifty percent (50%) of the voting stock of a Member, if a Member is a corporation, or the Transfer of an interest or interests of at least fifty percent (50%) in the capital or profits of a Member (whether accomplished by the sale or exchange of interests or by the admission of new partners or members), if a Member is a partnership or limited liability company, or the cumulative Transfer of such interests in a Member which effectively equal the foregoing (including Transfer of interests followed by the incorporation of a Member and subsequent stock Transfers, or Transfers of stock followed by the liquidation of a Member and subsequent Transfers of interests) will be deemed to constitute a Transfer of the Member's entire Membership Interest.

**35.** **Unrecovered Capital.** Invested Capital of a Member less the aggregate amount of cash and the net fair market value of all property distributed to such Member pursuant to Section 5.1.1(b). The net fair market value of property shall be its fair market value at the time of distribution, net of any liabilities secured by such property that the transferee is considered to assume or take subject to or under Section 752 of the Code.

## SCHEDULE 5.2

### Tax and Accounting Matters

**1.    Limitation on Losses.** Losses allocated pursuant to Section 5.2 of the Agreement shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 5.2 of the Agreement, the limitation set forth in this Section 1 shall be applied on a Member by Member basis and Losses not allocated to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations. Before any Profits are allocated as provided in the Agreement, Profits shall first be allocated to the Members to whom Losses have been allocated pursuant to this section and in proportion to the amount of Losses previously allocated to such Members.

### 2.    Special Allocations.

**2.1    Minimum Gain Chargeback.** Notwithstanding Section 5.2 of the Agreement, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Section 1.704-2(g)(2) of the Regulations. Allocations pursuant to this Section 2.1 shall be made in proportion to the amounts required to be allocated to each Member under this Section 2.1. The items to be so allocated shall be determined in accordance with Section 1.704-2(j)(2) of the Regulations. This Section 2.1 is intended to comply with the minimum gain chargeback requirement contained in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

**2.2    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt.** Notwithstanding Section 5.2 of the Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Section 1.704-2(i)(5) of the Regulations) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Section 1.704-2(i)(5) of the Regulations). Allocations pursuant to this Section 2.2 shall be made in proportion to the amounts required to be allocated to each Member under this Section 2.2. The items to be so allocated shall be determined in accordance with Section 1.704-2(i)(4) of the Regulations. This Section 2.2 is intended to comply with the minimum gain chargeback requirement contained in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

**2.3** **Nonrecourse Deductions.** Notwithstanding Section 5.2 of the Agreement, any nonrecourse deductions (as defined in Section 1.704-2(b)(1) of the Regulations) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

**2.4** **Member Nonrecourse Deductions.** Notwithstanding Section 5.2 of the Agreement, those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Section 1.704-2(i) of the Regulations.

**2.5** **Qualified Income Offset.** Notwithstanding Section 5.2 of the Agreement, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 2.5 shall be taken into account in computing subsequent allocations of income and gain pursuant to Section 5.2 of the Agreement so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to Section 5.2 of the Agreement to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 2.5 if such unexpected adjustments, allocations, or distributions had not occurred.

**2.6** **Code Section 754 Adjustment.** To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a Distribution to a Member in complete liquidation of his or her interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such Distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

**2.7** **Allocations Relating to Taxable Issuance of Membership Interests.** Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest in the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

**3. Curative Allocations.** The allocations set forth in Sections 2.1 through 2.6 of this Schedule 5.2 (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 3. Therefore, notwithstanding any other provision of this Schedule 5.2 (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner the Manager determines to be appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 5.2 of the Agreement. In exercising its discretion under this Section 3, the Manager shall take into account future Regulatory Allocations under Sections 2.1 and 2.2 that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 2.3 and 2.4.

**4. Other Allocation Rules.**

**4.1** For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

**4.2** Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are in proportion to their Capital Percentages.

**4.3** To the extent permitted by Section 1.704-2(h)(3) of the Regulations, the Manager shall endeavor not to treat Distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt.

**5. Tax Allocations: Code Section 704(c).** In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with Section 9(e)(i) of this Schedule 5.2). In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 9(e)(ii) of this Schedule 5.2, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items, or Distribution pursuant to any provisions of this Agreement.

6.    **Tax Elections.** In the event of a transfer of a Membership Interest or the Distribution of Company property, the Manager shall determine whether the Company shall file an election under Section 754 of the Code to adjust the tax basis of Company property. Upon the adjustment of the tax basis of any Company property pursuant to an election made under Section 754 of the Code, the Capital Accounts of the Members shall be adjusted in accordance with Section 1.704-1(b)(2)(iv)(m) of the Regulations. The Manager shall have the right, in its sole discretion, to make, refuse to make, or revoke on behalf of the Company, any elections or determinations required or permitted for federal or state income tax or other tax purposes, including but not limited to any election with respect to the method of depreciation to be taken on Company property or assets. The Manager may rely upon the advice of the Company's independent certified public accountants or tax attorneys with respect to the making of any such election.

7.    **Withholdings as Deductions.** For California tax purposes, each Member which is a nonresident of California shall execute and deliver to the Company the agreement of such nonresident Member required by Section 18633.5 of the California Revenue and Taxation Code (the "Nonresident Tax Agreement") no later than sixty (60) days after becoming a Member. If any nonresident Member fails to deliver a Nonresident Tax Agreement, the Company shall be required to make payments to the State of California pursuant to Section 18633.5 of the California Revenue and Taxation Code and any such payments shall be treated as Distributions to such Member for all purposes under this Agreement. If such payments exceed the amount of Distributions such Member would otherwise have received from the Company, such Member shall be obligated to return such excess payments to the Company, plus interest at the rate of ten percent (10%) per annum from the date of such excess payments.

8.    **Tax Matters Partner.** The Manager shall be the "Tax Matters Partner", as defined in Section 6231 of the Code. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, [a Majority Interest/all] of the Members may designate another to be Tax Matters Partner.

9.    **Definitions.** When used in the Agreement or this Schedule 5.2, the following terms shall have the meanings set forth below:

(a)    **Adjusted Capital Account Deficit.** With respect to any Member, Adjusted Capital Account Deficit shall mean the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (i) credit to such Capital Account of any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the next to last sentences of the Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital

Account the items described in Sections 1.704-1(b)(2)(i)(d)(4), (5) and (6) of the Regulations. This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

        **(b)**     **Company Minimum Gain.** The meaning ascribed to the term "Partnership Minimum Gain" in the Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

        **(c)**     **Capital Account.** With respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

        (i)     To each Person's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 2 or Section 3 of this Schedule 5.2, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

        (ii)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 2 or Section 3 of this Schedule 5.2, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

        (iii)     In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the Assignee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

        (iv)     In determining the amount of any liability for purposes of Sections 9(c)(i) and 9(c)(ii) of this Schedule 5.2, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Manager may make such modification, provided that is not likely to have a material effect on the amounts distributable to any Member pursuant to Article 5 of the Agreement upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

        **(d)**     **Depreciation.** For each Fiscal Year, an amount equal to the depreciation,

amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

        **(e)**    **Gross Asset Value.** With respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

        **(i)**    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager, provided that, if the Manager is the contributing Member, the determination of the fair market value of the contributed asset shall require the consent of a majority of the other Members;

        **(ii)**    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the Distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

        **(iii)**    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of Distribution as determined by the distributee and the Manager, provided that, if the Manager is the distributee, the determination of the fair market value of the contributed asset shall require the consent of a majority of the other Members; and

        **(iv)**    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704- 1(b)(2)(iv)(m) and Sections 9(i)(vi) and 2.6 of this Schedule 5.2; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 9(e)(iv) to the extent the Manager determines that an adjustment pursuant to Section 9(e)(ii) of this Schedule 5.2 is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 9(e)(iv). If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section 9(e)(i), Section 9(e)(ii), or Section 9(e)(iv) of this Schedule 5.2, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

        **(f)**    **Member Nonrecourse Debt.** The meaning ascribed to the term "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Regulations.

        **(g)**    **Member Nonrecourse Deductions.** Items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

        **(h)**    **Nonrecourse Liability.** As set forth in Section 1.752-1(a)(2) of the Regulations.

**(i)** **Profits and Losses.** For each Fiscal Year, an amount equal to the Company's Taxable Income or Loss for such Fiscal Year (for this purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in Taxable Income or Loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 9(i) shall be added to such Taxable Income or Loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(0, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 9(i) shall be subtracted from such Taxable Income or Loss;

(iii)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 9(e)(ii) or Section 9(e)(iii) of this Schedule 5.2, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses.

(iv)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such Taxable Income or Loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with Section 9(d) of this Schedule 5.2;

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provision of this Section 9(i), any items which are specially allocated pursuant to Section 2 or Section 3 of this Schedule 5.2 shall not be taken into account in computing Profits or Losses.

(viii) The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 2 or Section 3 of this Schedule 5.2 shall be determined by applying rules analogous to those set forth in Sections 9(i)(i) through 9(i)(vi) of this Schedule 5.2.

**(i)** **Taxable Income and Losses.** Net income and losses determined by the Certified Public Accountants or tax attorneys employed by the Company for tax purposes and reported on the Company's informational tax return.

# EXHIBIT A

## Members' Contributions

BK Sems, USA, Inc's Contribution: Management expertise and advisory services for the design and manufacture of digital display solutions.

---

Display Points Group, Inc's Contribution: All assets of Display Points Group, Inc. including but not limited to: Management expertise, clients, sales and distribution capabilities; customer lists, regulatory approvals, rights, interests, advertising and other contracts, pilot agreements, other agreements, licenses, designs, filings, patents, process patents, intellectual properties.

36

# E X H I B I T   B

## Members' Percentage Distribution Share

### Share of Company's EBITDA

| Member's Name | Address | Share |
|---|---|---|
| BK Sems USA, Inc. | 501 South Idaho Street Suite 290, La Habra, CA 90631 | 50% |
| Display Points Group, Inc. | 8901 Harrell Ave. Treasure Island, Florida 33706 | 50% |
| *TOTALS:* | | 100% |

# EXHIBIT B

From:           Tom Bloss [tom@tabletopsusa.com]
Sent:           Friday, January 27, 2012 12:21 PM
To:             dhazzard@displaypoints.com
Subject:        Re: Venue Procurement Agreement

Haz,

I need to give Dan an update on this project later today.  Two questions I know he will want answers to are:

When will the agreement be signed and returned and when do you think the 1st $250,000 will be received by us?

Additionally, in order for us to begin approaching any venues, we will need a finalized venue agreement and a working display unit that demonstrates how the device will look and work.

I look forward to your response.

Tom Bloss
Chief Financial Officer
tom@tabletopsusa.com
DC Media & Marketing
5524 S Fort Apache Road, Suite 110
Las Vegas, NV 89148
Toll Free # 800.278.8707
702.686.6136 (cell)

On Jan 27, 2012, at 8:52 AM, dhazzard@displaypoints.com wrote:


Thanks, Tom. Let's plan on speaking next week when Dave gets back from San Juan. I'd like to begin timelining our project. Haz


David Hazzard
Display Points
501 N. Idaho St., Suite 290
LaHabra, CA 90631
813.785.8668  Mobile
dave.hazzard1 Skype
DHazzard@DisplayPoints.com
www.DisplayPoints.com



-----Original Message-----
From: Tom Bloss [mailto:tom@tabletopsusa.com]
Sent: Friday, January 27, 2012 11:25 AM
To: dhazzard@displaypoints.com
Subject: Re: Venue Procurement Agreement

1

# EXHIBIT C

This Venue Procurement Agreement (this "**Agreement**") is entered into on this ⅔1ˢᵗ day of January, 2012 (the "Effective Date"), by and between BKSEMS Media, LLC, dba Display Points Network ("**DP**") and DC Media & Marketing, Inc. ("**DCMM**"). DP and DCMM may sometimes be referred to individually as a "**Party**" and together as the "**Parties**".

**RECITALS**

WHEREAS, DP is engaged in the development, production, distribution, maintenance and operation of the Display Points tabletop devices for use at restaurants, bars and similar establishments (the "**Devices**");

WHEREAS, DCMM is engaged in creative and non-traditional media marketing services and has considerable experience in placing non-traditional marketing devices in at restaurants, bars and similar establishments;

WHEREAS, DP desires to engage DCMM to market the Devices to certain restaurants and bars and DCMM desires to enter said engagement.

NOW, THEREFORE, in consideration of the mutual promises and covenants made herein and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties, each intending to be legally bound, agree as follows:

1.    **ENGAGEMENT OF DCMM**

1.1    For valuable consideration as provided below, DP hereby engages DCMM to procure persons, companies, businesses and entities to enter into certain Advertising Sale Agreements and Venue Procurement Agreements with DP for placement of the Devices in restaurants, bars and similar establishments ("**Venue Procurement**").

2.    **VENUE PROCUREMENT**

2.1    DCMM shall meet with independent restaurants, bars and similar establishments (collective the "**Venues**") and shall use commercial reasonable best efforts, subject to the conditions below, to promote the Devices and to obtain commitments from Venues to enter into Venue Procurement Agreements with DP.

2.2    DCMM Obligations:

2.2.1    Prior to presenting a Venue with a Venue Procurement Agreement for the placement of a Device or Devices in the Venue, DCMM shall first submit the

2.2.3 Upon receipt of approval by DP of a proposed Venue, DCMM shall provide the proposed Venue with a ~~one (1)~~ year Venue Procurement Agreement with option for renewal.  ∧ three (3)

2.2.4 DCMM shall only use DP approved Venue Procurement Agreements.

2.2.5 DP shall countersign the Venue Procurement Agreement upon approval thereof by DP.

2.2.6 In the event a Venue terminates the Venue Procurement Agreement, for any reason other than negligence, misconduct, or breach of any provision of the Venue Procurement Agreement by DP, within the first twelve (12) months after execution by DP thereof, DCMM shall use commercially reasonable best efforts, to obtain a replacement commitment from an equally commercially appropriate Venue at no additional cost to DP.

## 2.3 DP Obligations:

2.3.1 DP shall obtain and secure all creative content, advertising materials and intellectual property for use by the Venue with the Devices ("**Materials**") from the Venue pursuant to the specific Venue Procurement Agreement entered into between DP and the Venue.

2.3.2 DP shall coordinate and facilitate all scheduling and routing of the Materials to the Venue.

2.3.3 Subject to the terms of the Venue Procurement Agreement between DP and the Venue, DP shall review all Materials of the Venue and may, in its sole discretion, reject any Materials for any reason whatsoever. No Materials shall be unreasonably rejected by DP.

2.3.4 Any and all Materials submitted by the Venue and which are approved by DP shall be uploaded by DP to the appropriate Devices of the Venue. Subject to the terms of the Venue Procurement Agreement, DP shall provide any necessary maintenance for continual use of the Material within the Devices by the Venue.

2.4    DCMM Compensation:

2.4.1    DCMM shall receive a one-time fee of One Thousand Dollars ($1,000) for each Venue presented by DCMM and approved by DP that executes a Venue Procurement Agreement (the **"DCMM Venue Compensation"**).

2.4.2    DCMM shall receive as initial compensation for services rendered or to be rendered to DP under this Agreement, payment of Two Hundred Fifty Thousand Dollars ($250,000)(**"Initial Payment"**). Upon execution of this Agreement by the Parties, DP shall deliver to DCMM payment of the Initial Payment in cash or certified funds. The execution of this Agreement shall be effect the 31st day of January, 2012 (the **"Closing Date"**).

2.4.3    DCMM shall receive payment of a second Two Hundred Fifty Thousand Dollars ($250,000) once DP obtains 250 Venue Procurement Agreement through the efforts and services provided by DCMM under this Agreement. The balance of $500,000.00 will become due once DCMM obtains 1000 Venue Procurement Agreements for DP.

3.    **TERM OF AGREEMENT; BENCHMARKS; TERMINATION**

3.1    This agreement shall be effective for a term not to exceed twenty-four (24) months (the "Term") commencing with the Effective Date, provided that DCMM shall have the right to renew the term hereof upon the exact terms hereof for successive one (1) year periods at its option immediately upon completion of the base Term hereof, unless otherwise extended or renewed in writing by the Parties.

3.2    By or before each six (6) month anniversary of the execution of this Agreement, DCMM shall submit to DP a report outlining its performance over the previous six (6) months, the clients that it is pursuing, the likelihood that the pursued clients will close, and a strategy for future client development.

3.3    Either Party may terminate this Agreement at any time for any reason or no reason with ninety (90) days prior written notice.

3.4    This Agreement shall immediately terminate upon any of the following events of default by either Party:

3.4.1    Either Party breaches this Agreement and the non-breaching Party determines, in its sole opinion, that such breach is not capable of remedy;

either Party's obligations or impairs either Party's ability to discharge its obligations under the Agreement.

3.4.3  Either Party institutes or suffers the institution against it of bankruptcy, reorganization, liquidation, receivership or similar proceedings;

3.4.4  Either Party becomes unable to pay its debts as they become due;

3.4.5  Any term, condition or provision of this Agreement becomes invalid or illegal under any applicable law, rule or regulation, or

3.4.6  Either Party undergoes a Change of Control. For purposes of this section, a "Change of Control" shall mean (i) the merger, consolidation or sale of equity securities of either Party by its equity holders or the Party, in each case, in a transaction as a result of which the beneficial owners of the outstanding voting securities of the Party immediately prior to such transaction do not own, directly or indirectly through other entities, a majority of the outstanding voting securities immediately following such a transaction in substantially the same proportion; provided, however, that a Change of Control shall not include transfers to current members of any limited liability company which is a member of the Party or transfers to Partners of any partnership which is a member of the Party, or (ii) the sale, transfer or other disposition of all or substantially all of the Party's assets in connection with the sale of the Party's business to another party or pursuant to the liquidation or dissolution of the Party.

3.5  Notwithstanding the provisions of Section 4.3, hereof, if DCMM terminates this agreement, DCMM shall forgo any outstanding payments from DP.

4.  **MISCELLANEOUS**

directors; stockholders; partners; limited partners; joint venturers; agents; representatives; employers; employees; servants; volunteers; contractors; predecessors; successors; assigns; heirs; beneficiaries; executors; administrators; estates; attorneys; claim administrators; insurers; and re-insurers (hereinafter **"DP Indemnitees"**) from and against any and all demands, claims, suits, causes of action, losses, whether groundless or not, penalties, liabilities, judgments, settlements, damages, costs, attorneys' fees, and expenses of any nature, including without limitation attorney's fees and court costs (hereinafter **"Claims"**) which arise or are alleged to arise directly or indirectly from any breach of this Agreement by DCMM or any act or act or omission by DCMM or its employees, agents, subcontractors, suppliers or materialism at any tier whether or not occurring or arising out of or claimed to have occurred or arisen out of the concurrent acts or omissions (including negligence) of DP Indemnitee against Claims caused by or resulting from the DP hereunder. DCMM's indemnitee obligations hereunder shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist. DCMM's indemnity obligations hereunder shall not be limited in any way by the availability of insurance coverage or by any limitation on the amount or type of damages, compensation or benefits payable by or for DCMM under any Worker's compensation acts, disability benefits acts or other employee benefits acts.

4.1 Indemnification. DCMM shall shall indemnify, defend and hold harmless DP and all of DP's (past, present and future) parent, subsidiary, and affiliate companies; officers; directors; stockholders; partners; limited partners; joint venturers; agents; representatives; employers; employees; servants; volunteers; contractors; predecessors; successors; assigns; heirs; beneficiaries; executors; administrators; estates; attorneys; claim administrators; insurers; and re-insurers (hereinafter **"DP Indemnitees"**) from and against any and all demands, claims, suits, causes of action, losses, whether groundless or not, penalties, liabilities, judgments, settlements, damages, costs, attorneys' fees, and expenses of any nature, including without limitation attorney's fees and court costs (hereinafter **"Claims"**) which arise or are alleged to arise directly or indirectly from any breach of this Agreement by DCMM or any act or act or omission by DCMM or its employees, agents, subcontractors, suppliers or materialism at any tier whether or not occurring or arising out of or claimed to have occurred or arisen out of the concurrent acts or omissions (including negligence) of DP Indemnitee against Claims caused by or resulting from the DP hereunder. DCMM's indemnitee obligations hereunder shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist. DCMM's indemnity obligations hereunder shall not be limited in any way by the availability of insurance coverage or by any limitation on the amount or type of damages, compensation or benefits payable by or for DCMM under any Worker's compensation acts, disability benefits acts or other employee benefits acts.

of its affiliates, directly or indirectly; nor (b) engage in any other conduct or make any other statement, directly or indirectly, that could be reasonably expected to impair the goodwill of the other Party or its affiliates, or the reputation of the other Party or its affiliates. Furthermore, the Parties agree that there shall be no communications, either verbal or written, with the press or other media or any customer, client or supplier of company, that criticize, ridicule or make any statement which disparages or is derogatory of the other Party or any of their respective employees, directors or senior officers of DP or DCMM. Each Party agrees not to defame or otherwise make any public statement regarding the other Peary or any directory, officer or employee thereof which would materially injure the reputation of the other Party or such director, officer or employee, other than might be otherwise required by law to be made public, in which case the Party about to make such statement shall notify the other Party at least ten (10) business days in advance of such disclosure.

4.3 Amendments. Except as otherwise provided herein, this Agreement may be amended in any respect, from time to time, with the signed written approval of both Parties.

4.4 Governing Law. This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida.

4.5 Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision thereof.

4.6 Provisions Severable. The provisions of this Agreement are intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of any other provision of this Agreement.

4.7 Entire Agreement. This Agreement sets forth the complete expression of the understanding of the Parties with respect to the subject matter hereof and supersedes any and all other prior agreements, understandings and negotiations of the Parties, whether written or oral.

4.8 Interpretation. All pronouns and variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

4.9 Successors and Assigns. Except as otherwise specifically provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their legal representatives, heirs, administrators, executors, successors, and assigns.



agreement binding on all Parties hereto.

4.11 <u>Further Assurances</u>. The Parties each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of this Agreement.

4.12 <u>Dispute Resolution</u>. Any controversy or claim arising under or related to this Agreement shall first be submitted to mediation under the Commercial Mediation Rules of the American Arbitration Association. Thereafter, any unresolved controversies of claims arising hereunder shall be settled by arbitration under the Commercial Rules of the American Arbitration Association. The location of any such mediation and/or arbitration shall be Pinellas county, Florida. The arbitrator shall be selected form the national technology panel of the American Arbitration Association. Any Court having a jurisdiction over the matter may enter a judgment upon the award of the arbitrator. Service of a petition to confirm the arbitration award may be made by United States Mail, postage prepaid, or by any regularly conducted commercial express mail service, to the attorney for the party or, if not so represented, to the party at the address set forth herein, or to the party's last known business address. The prevailing party in any acton or proceeding shall be entitled to recover its reasonable attorney fees and its arbitration administrative fees and arbitrator fees.

4.13 <u>Construction</u>. No provision of this Agreement will be interpreted or construed against a party because that party or its legal representative drafted or negotiated that provision.

4.14 <u>Interpretation</u>. Unless the context of the Agreement clearly requires otherwise:

4.14.1 References to the plural include the singular, the singular, the Plutarch, and the part the whole;

4.14.2 References to one gender includes all genders;

4.14.3 "or" has the inclusive meaning identified with the phrase "and/or";

4.14.4 "includes" and "including" have the inclusive meaning identified with the phrases "including but not limited to," "including without limitation," "includes but is not limited to" and "includes without limitation;" and

4.14.5 The terms "dollars" and "$" refer to United States dollars.

4.15 <u>Section References</u>. Section, subsection, exhibit, annex and schedule references are to this Agreement as originally signed unless otherwise specified.

4.16 <u>Statutory Reference</u>. Any reference to any statue, rule, regulation, or agreement.

IN WITNESS WHEREOF, executed as of the first date set forth above

BKSEMS MEDIA, LLC,
dba Display Points Network

By: DAVID HAZZARD
Its: MANAGER

DC MEDIA AND MARKETING, LLC dba
DC SALES INC.

By: DAN CURTIN
Its: PRESIDENT

# EXHIBIT D

## AMENDMENT TO AGREEMENT

As of April 1st, 2012, the Venue Procurement Agreement entered into on the 31st day of January, 2012 (the "Effective Date"), by and between BKSEMS Media, LLC dba Display Points Network and DC Media and Marketing, Inc. is amended to replace BKSEMS Media, LLC with Display Points Group, Inc and replace DC Media and Marketing, Inc. with DC Media and Marketing dba DC Sales, Inc. The first paragraph is amended and will read as follows:

> *"This Venue Procurement Agreement (this "Agreement") is entered into on this 31st day of January, 2012 (the "Effective Date"), by and between Display Points Group, Inc. dba Display Points Network ("DP") and DC Media & Marketing dba DC Sales (DCMM). DP and DCMM may sometimes be referred to individually as a "Party" and together as the "Parties"."*

IN WITNESS WHEREOF, agreed upon and executed as of the date set forth above.

BKSEMS MEDIA , LLC     DC MEDIA AND MARKETING

By: David Hazzard        By: Dan Curtin
Its: Manager          Its: President

DISPLAY POINTS GROUP, INC.

By: David Hazzard
Its: President

# EXHIBIT E

**Bank of America** 🦅                                              **Online Banking**

**Business Economy Chk - 2086 Transaction Details**

| | |
|---|---|
| **Posting date:** | 04/10/2012 |
| **Amount:** | -250,000.00 |
| **Type:** | Withdrawal |
| **Description:** | WIRE TYPE:WIRE OUT DATE:120410 TIME:1224 ET TRN:2012041000176532 SERVICE REF:005501 BNF:DC MEDIA AND MARKETING ID:6123701200 BNF BK:WE LLS FARGO BANK, N.A. ID:121000248 PMT DET:75763568 DCMM CONTRACT |

# EXHIBIT F

| From: | Tom Bloss [tom@tabletopsusa.com] |
|---|---|
| Sent: | Tuesday, June 05, 2012 11:53 AM |
| To: | Dave Hazzard |
| Cc: | Dave Matera; Soni, Shameer |
| Subject: | Re: Display units and bar owners contract... |

Dave,

Dan is traveling and won't be back in the office until Friday. To expedite matters, send the amendment you need signed, the prototype units and state by state bar contracts and I will present to Dan for his review on Friday.

**Tom Bloss**
**Chief Financial Officer**
tom@tabletopsusa.com
DC Media & Marketing
5524 S Fort Apache Road, Suite 110
Las Vegas, NV 89148
Toll Free # 800.278.8707
702.686.6136 (cell)

On Jun 5, 2012, at 8:14 AM, Dave Hazzard wrote:

Tom-
The prototypes and venue sales packages should be in your hands by Friday if we can get some matters cleaned up.
1) The original contract is between BKSEMS Media and DCMM. Dan, verbally agreed to amend that contract to have Display Points Group as the signatory party. BKSEMS Media is no longer a viable entity. Before funds were wired from DPG both parties agreed to that modification. This needs to be memorialized in writing.
2) Dan was to get with DPG representatives and submit a timetable and DMA report as to when the first 1000 venues would be procured. This was to be jointly developed with input from Diageo barnds.
Haz

From: Tom Bloss [mailto:tom@tabletopsusa.com]
Sent: Monday, June 04, 2012 6:21 PM
To: Dave Hazzard
Subject: Display units and bar owners contract...

Dave,

Dan is traveling but he asked me to followup with you regarding the display units and bar contacts that we are expecting to receive this week. We have a scheduled conference call set for early next week and want to be assured that we have these two items so that we can complete the sales process asap.

Please let me know if Dan's expectations are the same as yours. We need time to get our logistical plan in place so a timely update would be greatly appreciated.

Thanks,

Tom Bloss
Chief Financial Officer
tom@tabletopsusa.com
DC Media & Marketing
5524 S Fort Apache Road, Suite 110
Las Vegas, NV 89148
Toll Free # 800.278.8707
702.686.6136 (cell)

# EXHIBIT G

| From: | dan@tabletopsusa.com |
|---|---|
| Sent: | Wednesday, June 13, 2012 1:37 PM |
| To: | Dave Hazzard |
| Cc: | Steven Mayfield; Tom Bloss |
| Subject: | Re: Assisgnment |
| Attachments: | image001.png |

Hi Dave! I'am traveling. All docs are at attorney's. I'll forward excerpts from your BK SEMS operating agreement to them and follow up. Thanks,Dan
Sent from my Verizon Wireless BlackBerry

---

**From:** "Dave Hazzard" <dhazzard@displaypoints.com>
**Date:** Wed, 13 Jun 2012 13:07:58 -0400
**To:** <dan@tabletopsusa.com>
**Cc:** Dave Matera<dmatera@oohpitch.com>
**Subject:** Assisgnment

Dan-

   Please let me know the status of the assignment of the Venue Procurement Agreement. As you know because of non-performance issues I have decided to not utilize BKSEMS-USA or continue the JV relationship with BKSEMS Media. This is the last loose end to tie up. Below are excerpts from the JV Operating Agreement that give me authority to sign transactions.

   While the parting has been amicable, they did bring up their previous Diageo involvement. I would not want them to skew any relationships you have fostered.
Dave

### From BKSEMS MEDIA Op Agreement

**4.2.1 Number, Term, and Qualifications.** The Company shall initially have two Managers: Dave Hazzard (Sales Operations Manager) and BK Sems USA, Inc. (Manufacturing & Products Manager). The Manager(s) shall hold office until resignation or removal. A Manager need not be a Member of the Company.

### 4.3 Powers of Manager.

**4.3.1 Powers of Manager.** Without limiting the generality of Section 4.1, but subject to Section 4.3.2 and to the express limitations set forth elsewhere in this Agreement, a Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the company including, without limitation, the power to exercise on behalf of and in the name of the Company all of the powers described in Corporations Code Section 17003.

*David A. Hazzard, CEO*



*8901 Harrell Ave.*
*Treasure Island, FL USA 33706*
*813.785.8668 Mobile*
*dave.hazzard1 Skype*

1

2

# EXHIBIT H

# STARK&STARK
A PROFESSIONAL CORPORATION

THOMAS S. ONDER
DIRECT DIAL NUMBER
(609) 219-7458
DIRECT FAX NUMBER
(609) 895-7395
E-MAIL
tonder@stark-stark.com

ATTORNEYS AT LAW

OFFICE:  993 LENOX DRIVE  LAWRENCEVILLE, NJ  08648-2389

MAILING:  PO BOX 5315  PRINCETON, NJ  08543-5315

609-896-9060 (PHONE)   609-896-0629 (FAX)

WWW.STARK-STARK.COM

July 30, 2012

**VIA Federal Express**
DC Media & Marketing
5524 S. Fort Apache Road, Ste 110
Las Vegas, NV 89148
Attn: Dan Curtain

Re:     **Contract with BK SEMS Media, LLC**
        **Demand for Return of $250,000**

Dear Mr. Curtain:

Our firm represents BK SEMS Media, LLC dba Display Points Network.  Kindly take this letter as written notice that the agreement dated January 31, 2012 (the "Agreement") is hereby terminated due to your failure to perform.  Demand is made for the immediate return of the $250,000 Initial Payment.

Specifically, DC Media & Marketing failed to perform under the Agreement as it did not obtain approval by my client of the proposed Venue.  Your efforts to perform under the Agreement were not commercially reasonable.

As such, kindly remit to my office within the next five (5) days a check payable to "BK SEMS Media, LLC" and my client shall consider this matter closed.  Failure to do so will result in my client proceeding with all available remedies in equity and at law.

Please be guided accordingly,

STARK & STARK
A Professional Corporation

By:
        THOMAS S. ONDER

cc:     BKSEMS Media, LLC dba Display Points Network
        Hutchinson & Steffen
        Attn: Stephen J. Mayfield, Esquire (via Email and Mail)